NOAH G. BLECHMAN (State Bar No. 197167)
Noah.Blechman@mcnamaralaw.com
JOHN J. SWAFFORD (State Bar No. 321174)
John.Swafford@McNamaraLaw.com
McNAMARA, AMBACHER, WHEELER,
HIRSIG & GRAY LLP
3480 Buskirk Avenue, Suite 250
Pleasant Hill, CA 94523
Telephone: (925) 939-5330
Facsimile: (925) 939-0203

Attorneys for Defendants
CITY OF ANTIOCH, JAKE MERRILL;
ALEJANDRO LORONO; and MARCOS MOLINA

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ABDUL BAHRAMI; HALIMA BAHRAMI; DIANA BAHRAMI; ABRAHAM BAHRAMI; and S.B., by and through her guardian ad litem HALIMA BAHRAMI, individually and as successors-in-interest to David Bahrami,

Plaintiffs,

vs.

CITY OF ANTIOCH; JAKE MERRILL; ALEJANDRO LORONO; MARCOS MOLINA, and DOES 1-10,

Defendants.

Case No. 3:26-cv-06281 JSC

**DEFENDANTS JAKE MERRILL, ALEJANDRO LORONO, AND MARCOS MOLINA'S ANSWER TO COMPLAINT FOR DAMAGES**

Defendants JAKE MERRILL, ALEJANDRO LORONO and MARCOS MOLINA's ("Defendants") responds as follows to Plaintiffs' Complaint for Damages ("Complaint"). The CITY has already answered in this matter. Defendants demand a jury trial in this action.

## I.<u>INTRODUCTION</u>

1. Defendants neither admit nor deny Plaintiffs' recitations in Paragraph 1 in the "INTRODUCTION" Section of the Complaint because it includes contentions and legal matters, as well as arguments, not proper for admission or denial. Except as expressly admitted herein, Defendants deny each and every allegation of Paragraph 1.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## II. JURISDICTION AND VENUE

1. Defendants admit that this District Court has federal question jurisdiction over the claims brought pursuant to 42 U.S.C. § 1983, and that venue is proper because the alleged incident occurred in the City of Antioch, in Contra Costa County, within the Northern District of California, as alleged in Paragraphs 2 and 4. Defendants neither admit nor deny the remaining assertions in Paragraphs 2 and 4 because they include contentions and legal matters, as well as arguments, not proper for admission or denial.

2. Defendants neither admit nor deny the allegations in Paragraph 3 because it includes contentions and legal matters not proper for admission or denial.

3. As to Paragraph 5, Defendants admit that a claim for damages was tendered to the CITY and that no written notice of rejection was served. Defendants neither admit nor deny the remaining allegations in Paragraph 5, including the characterization of the claim as "comprehensive and timely," because they include contentions and legal matters not proper for admission or denial, and Defendants expressly deny that all Plaintiffs complied with the claim presentation requirements of the California Government Claims Act as to all claims and theories pled herein.

## III. PARTIES

1. Defendants admit that Decedent David Bahrami (“Decedent”) died on June 30, 2025, and that he apparently resided in Antioch, California. Defendants neither admit nor deny the remaining allegations in Paragraph 6 because they include contentions and legal matters not proper for admission or denial.

2. Defendants neither admit nor deny the allegations in Paragraphs 7 through 11 because they include contentions and legal matters not proper for admission or denial, and Defendants lack sufficient information to admit or deny the allegations regarding Plaintiffs' residency, familial status, capacity, and standing, and on that basis denies them.

3. As to Paragraph 12, Defendants admit that the CITY is an incorporated public entity organized under the laws of the State of California and that it operates the Antioch Police Department ("APD"). Defendants admit that JAKE MERRILL, ALEJANDRO LORONO, and MARCOS MOLINA were employed by APD on June 30, 2025. Defendants neither admit nor deny

the remaining allegations in Paragraph 12 because they include contentions and legal matters, as well as arguments, not proper for admission or denial, and Defendants expressly deny that it is liable under any theory alleged.

4. As to Paragraphs 13, 14, and 15, Defendants admit that JAKE MERRILL, ALEJANDRO LORONO, and MARCOS MOLINA were police officers employed by APD on June 30, 2025, and were acting within the course and scope of their employment in relation to their encounter with Decedent. Defendants deny that any of these Defendants acted "with complete authority and ratification" of the CITY, and neither admits nor denies the remaining allegations because they include contentions and legal matters not proper for admission or denial.

5. Defendants neither admit nor deny the allegations in Paragraphs 16 through 21 because they include contentions and legal matters not proper for admission or denial, and denies that DOES 1-10 acted with the complete authority or ratification of the CITY.

6. Defendants neither admit nor deny the allegations in Paragraphs 22 and 23 because they include contentions and legal matters not proper for admission or denial. Defendants expressly deny that it is liable under California Government Code § 815.6, and deny that any statute imposing a mandatory duty has been identified.

## IV. FACTUAL ALLEGATIONS

1. Defendants neither admit nor deny the allegations in Paragraphs 24 through 36 because they include contentions and legal matters and arguments, not proper for admission or denial.

2. Defendants generally submit that on the morning of June 30, 2025, the Antioch Police Department ("APD") Dispatch Center received three 911 calls from a male later identified as David Bahrami ("Decedent"), in which he stated words to the effect of "I'm about to kill someone," provided his residential address, asked how far away officers were and how many were responding, stated in one call that his family was inside the residence and in another that no one was with him, stated that he had no weapons, and refused each time to provide his name before terminating the call. (**Ex. A**, District Attorney's Report of Incident, at 17-18.)

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

3. Responding officers staged several blocks from the residence in order to gather information and develop a coordinated tactical response (Ex. A at 26). Officers were advised that Decedent had previously been detained on a Welfare and Institutions Code § 5150 hold in December 2024 (Ex. A at 24), that firearms had been seized from the residence during that prior incident (*id*. at 30), and that an officer-safety advisory was attached to the address (*id*. at 32).

4. Officer Merrill contacted Decedent by telephone and remained in communication with him across multiple calls spanning numerous minutes, calling back each time Decedent hung up. (Ex. A at 18.) Decedent refused to allow his family to come outside, refused to let officers speak with them, declined Officer Merrill's offer to summon medical aid for a reported injury, stated "I need cops" and "You are enough to do the job," and repeatedly demanded that officers come to his house. (Ex. A at 9.) Decedent then told Officer Merrill that he would kill or harm his neighbor if officers did not come. (Ex. A at 10.). These comments and this behavior made officers believe that Decedent may have already harmed his family, was preparing to harm them, or was planning to harm or ambush officers.

5. Before contact was made, Sergeant Mulholland assigned roles to the officers on scene (around the corner from Decedent's residence). Decedent then exited the residence and walked toward the officers, only appearing to have a phone in his hand, and officers ordered him to stop and to kneel on the ground, but Decedent did not comply. (Ex. A at 11.) Instead, Decedent reached his right hand to his waistband, produced a large kitchen knife, and began to run towards the officers. An officer deployed the 40 mm less-lethal launcher, which did not stop Decedent. (Ex. A at 12.) Decedent continued to run with the knife in his right hand, closing the distance diagonally in front of the officers, then turned and ran directly at them. Two officers discharged their firearms, causing Decedent to fall to the ground, still with the knife in his hand. (Ex. A at 13.). Decedent was still a potential threat at that point until he could be disarmed and controlled.

6. After falling, Decedent retained the knife in his hand and did not comply with repeated commands to drop it. A second 40 mm less-lethal round was fired in an attempt to disarm him, and an attempted taser deployment malfunctioned. Officers then kicked the knife from Decedent's hand. (Ex. A at 14.) Officers handcuffed Decedent and immediately started to render

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

emergency medical aid, including the application of chest seals and the administration of CPR, until relieved by arriving paramedics. (Ex. A at 28.) Decedent was pronounced deceased at the scene at approximately 7:54 a.m. (Ex. A at 38.)

7. The Contra Costa County District Attorney's Office conducted an independent investigation of this incident pursuant to the Law Enforcement Involved Fatal Incident Protocol and issued a public report on or about February 20, 2026, concluding that Officers Merrill, Lorono, and Molina acted in lawful self-defense and defense of others, that their use of force was reasonable under the circumstances (Ex. A at 48), and that no criminal charges or further action would be taken (*id*. at 52).

8. Defendants deny the remaining allegations in Paragraphs 24 through 36 because they include contentions and legal matters and arguments, not proper for admission or denial.

**Relevant Photographs from Ex. A (District Attorney Report), Pgs. 12-13, 17**




**Photo from Sgt. Mulholland's BWC showing (S) David Bahrami running with a knife in front of the officers 6/30/25 07:44:13**

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330




**Still shot from Officer Merrill's BWC at 07:44:15 depicting BAHRAMI running with the knife**





***The above photograph depicts the knife recovered on scene while positioned next to a tape measuring device.***

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

## V. CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Fourth Amendment—Excessive Force (42 U.S.C. Section 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI, as successors in interest to Decedent, against Defendants MERRILL, LORONO, MOLINA, and DOES 1-10)

1. In answering Paragraphs 37 through 50, Defendants incorporates by reference its responses to Paragraphs 1 through 36 of Plaintiffs' Complaint.

2. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 37 through 50 of Plaintiffs' Complaint, and specifically denies that any Defendant used excessive or unreasonable force or violated any right of Decedent secured by the Fourth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF

**Fourth Amendment: Denial of Medical Care (42 U.S.C. § 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against Defendants MERRILL, LORONO, MOLINA, and DOES 1-10)

3. In answering Paragraphs 51 through 57, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

4. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 51 through 57 of the Complaint, and specifically denies that any Defendant denied, delayed, or failed to summon medical care for Decedent or violated any right of Decedent secured by the Fourth Amendment to the United States Constitution.

## THIRD CLAIM FOR RELIEF

**Fourteenth Amendment: Interference with Familial Relationship (42 U.S.C. § 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against Defendants MERRILL, LORONO, MOLINA, and DOES 1-10)

5. In answering Paragraphs 58 through 67, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint. This claim is not asserted against the CITY, and no response is therefore required of the CITY.

6. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 58 through 67 of the Complaint, and specifically denies that any Defendant deprived Plaintiffs of any right to a familial relationship with Decedent secured by the Fourteenth Amendment to the United States Constitution.

**FOURTH CLAIM FOR RELIEF**

**Municipal Liability: Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against Defendant CITY and DOES 9-10)

7. In answering Paragraphs 68 through 76, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

8. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 68 through 76 of the Complaint, and specifically denies that it maintained any unconstitutional custom, practice, or policy, and denies that any such custom, practice, or policy was the moving force behind any injury to Decedent or Plaintiffs.

**FIFTH CLAIM FOR RELIEF**

**Municipal Liability: Failure to Train (42 U.S.C. § 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against Defendants CITY and DOES 9-10)

9. In answering Paragraphs 77 through 86, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

10. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 77 through 86 of the Complaint, and specifically denies that its training policies were inadequate and denies that it was deliberately indifferent to the rights of any person.

**SIXTH CLAIM FOR RELIEF**

**Municipal Liability for Ratification (42 U.S.C. § 1983)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against Defendants CITY and DOES 9-10)

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

11. In answering Paragraphs 87 through 95, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

12. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 87 through 95 of the Complaint, and specifically denies that any final policymaker of the CITY ratified the acts of any Defendant or the bases for them.

**SEVENTH CLAIM FOR RELIEF**

**Americans with Disabilities Act (42 U.S.C. § 12132)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against all Defendants)

13. In answering Paragraphs 96 through 104, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

14. As to Paragraph 98, Defendants admit that the CITY is a public entity within the meaning of 42 U.S.C. § 12131(1). As to Paragraph 101, Defendants deny that 42 U.S.C. § 12182 applies to the CITY, as that section is contained within Title III of the Americans with Disabilities Act and does not govern public entities.

15. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 96 through 104 of the Complaint.

**EIGHTH CLAIM FOR RELIEF**

**Battery (Wrongful Death)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against all Defendants)

16. In answering Paragraphs 105 through 114, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

17. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 105 through 114 of the Complaint.

**NINTH CLAIM FOR RELIEF**

**Negligence (Wrongful Death)**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against all Defendants)

18. In answering Paragraphs 115 through 123, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

19. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 115 through 123 of the Complaint.

**TENTH CLAIM FOR RELIEF**

**Negligent Infliction of Emotional Distress**

(All Plaintiffs against all Defendants)

20. In answering Paragraphs 124 through 132, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

21. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 124 through 132 of the Complaint, and specifically denies that any Plaintiff was present at the scene of the incident or contemporaneously perceived the injury-producing event.

**ELEVENTH CLAIM FOR RELIEF**

**Violation of Cal. Civil Code § 52.1**

(Plaintiffs ABDUL BAHRAMI and HALIMA BAHRAMI against all Defendants)

22. In answering Paragraphs 133 through 144, Defendants incorporate by reference its responses to Paragraphs 1 through 36 of the Complaint.

23. Except as to matters previously admitted, Defendants deny the remaining allegations in Paragraphs 133 through 144 of the Complaint.

**VI. JURY DEMAND**

1. Plaintiffs have demanded a jury trial. Defendants also demand a jury trial.

**VII. AFFIRMATIVE DEFNSES**

1. AS FOR A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs' Complaint fails to state cognizable legal theories and/or facts sufficient to constitute cognizable legal theories against any Defendant, including without limitation any claim for loss of consortium and any claim for punitive or exemplary damages against any Defendant.

2. AS FOR A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent Plaintiffs, or any of them, allege or assert matters not contained in a timely and legally sufficient claim presented to Defendants, or failed to present any such claim at all, this

action is barred or limited by the claims requirements set forth in California Government Code § 905 et seq., including without limitation §§ 910, 910.2, 911.2, 945.4, and 950.2.

3. AS FOR A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that Plaintiffs are barred from bringing this lawsuit, in whole or in part, based on the applicable statutes of limitations, including without limitation California Code of Civil Procedure § 335.1 and California Government Code §§ 911.2 and 945.6.

4. AS FOR A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs, or some of them, lack standing and capacity to commence or continue this action, in that they have failed to execute and file the affidavit or declaration required by California Code of Civil Procedure § 377.32, lack capacity pursuant to California Code of Civil Procedure §§ 377.30 and 377.33, are not persons entitled to bring an action for wrongful death pursuant to California Code of Civil Procedure § 377.60, and/or are minors for whom no guardian ad litem has been duly appointed, and/or have no legal standing to bring some or all of the causes of action in this case.

5. AS FOR A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs have failed to join necessary and indispensable parties to this action, and that an action for wrongful death is a single joint action in which all persons entitled to recover must be joined.

6. AS FOR A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that it is not liable for any injury alleged except as provided by statute, pursuant to California Government Code § 815.

7. AS FOR A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that it is not liable for any injury resulting from an act or omission of an employee of the public entity where that employee is immune from liability, pursuant to California Government Code § 815.2(b).

8. AS FOR AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs have identified no enactment imposing a mandatory duty upon Defendants, and that Defendants are not liable pursuant to California Government Code § 815.6.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

9. AS FOR A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that, as a public entity, it is not liable for punitive or exemplary damages, or for any other damages imposed primarily for the sake of example and by way of punishing the CITY defendant, pursuant to California Government Code § 818.

10. AS FOR A TENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that, as a public entity, the CITY or other Defendants are not liable for treble damages, statutory damages, or penalty damages, including any such damages sought pursuant to California Civil Code §§ 52 and 52.1, because such damages are imposed primarily for the sake of example and by way of punishing the defendant, and are therefore barred by California Government Code § 818.

11. AS FOR AN ELEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that, as a municipality, the CITY is immune from any award of punitive or exemplary damages under 42 U.S.C. § 1983.

12. AS FOR A TWELFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they are immune from liability for any injury caused by adopting or failing to adopt an enactment or by failing to enforce any law, and for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service, pursuant to California Government Code §§ 818.2 and 845.

13. AS FOR A THIRTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they are immune from liability for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or addiction, or from failing to prescribe for mental illness or addiction, pursuant to California Government Code § 855.8.

14. AS FOR A FOURTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they are immune from liability for injury resulting from determining in accordance with any applicable enactment whether to confine a person for mental illness or addiction, from determining the terms and conditions of any such confinement, or from the failure to confine, pursuant to California Government Code § 856.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

15. AS FOR A FIFTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent liability is premised upon California Government Code § 815.2(a), Defendants are immune because its employees are immune from liability for injury resulting from an act or omission that was the result of the exercise of the discretion vested in them, whether or not such discretion was abused, pursuant to California Government Code § 820.2.

16. AS FOR A SIXTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent liability is premised upon California Government Code § 815.2(a), Defendants are immune because its employees exercised due care in the execution and enforcement of the law and are immune pursuant to California Government Code § 820.4.

17. AS FOR A SEVENTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent liability is premised upon California Government Code § 815.2(a), Defendants are immune because its employees are not liable for an injury caused by the act or omission of another person, pursuant to California Government Code § 820.8.

18. AS FOR AN EIGHTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent liability is premised upon California Government Code § 815.2(a), Defendants are immune because its employees are immune pursuant to California Government Code § 821.6.

19. AS FOR A NINETEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at all times herein mentioned, all actions taken by Defendant's employees were taken under a good faith belief that the actions were not unlawful, that Defendant's employees reasonably relied upon information from police dispatch, computer-aided dispatch records, police records including officer-safety advisories attached to the subject address, aerial surveillance operators, and the reporting party himself in taking the actions complained of, and that Defendants and/or Defendant's employees are therefore immune under the "good faith immunity" and/or qualified immunity doctrines.

20. AS FOR A TWENTIETH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that to the extent liability is premised upon California Government Code § 815.2(a), Defendants are immune because the acts complained of, if any there were, were privileged

and justified as lawful self-defense and defense of others, and were reasonable and necessary to effect a detention and to overcome resistance, pursuant to Penal Code §§ 196, 197, 835, 835a, and 836, and Civil Code § 50, among other grounds.

21. AS FOR A TWENTY-FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that its employees rendered emergency medical services at the scene of an emergency and are liable in civil damages only for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith, that no such acts or omissions occurred, and that Defendants, and the public agency employing such employees, are not liable for civil damages where its employees are not liable, pursuant to California Health & Safety Code § 1799.106, nor can these claims be made under federal law.

22. AS FOR A TWENTY-SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they are immune from liability herein pursuant to the provisions of California Government Code §§ 810 through 996.6, the absolute privilege of Civil Code § 47(b), and/or other immunities provided by the Government Code, other California codes, and/or per federal law.

23. AS FOR A TWENTY-THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that they are not required to permit an individual to participate in or benefit from its services, programs, or activities when that individual poses a direct threat to the health or safety of others, pursuant to 28 C.F.R. § 35.139.

24. AS FOR A TWENTY-FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that any modification Plaintiffs contend was required would have fundamentally altered the nature of Defendants' service, program, or activity or imposed an undue financial and administrative burden, pursuant to 28 C.F.R. § 35.130(b)(7), and that exigent circumstances existed such that no accommodation or modification was reasonable, required, or feasible.

25. AS FOR A TWENTY-FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that punitive damages are not available under Title II of the Americans with Disabilities Act.

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

26. AS FOR A TWENTY-SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the damages recoverable on Plaintiffs' state law survival claims are limited to the loss or damage that Decedent sustained or incurred before death and do not include damages for pain, suffering, or disfigurement, because this action was filed on or after January 1, 2026, pursuant to California Code of Civil Procedure § 377.34(a).

27. AS FOR A TWENTY-SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the sole proximate cause of the injuries and damages, if any, allegedly suffered was the negligence, fault, and/or deliberate conduct of Decedent and/or others, or of any person or entity for whose acts or omissions Defendants are not legally or otherwise responsible, which constituted an intervening and superseding cause, or, in the alternative, that the negligence and fault of Decedent and/or others in and about the matters alleged in the Complaint herein proximately contributed to the happening of the incident and to the injuries, loss and damages complained of, if any there were, and said negligence requires that any damages awarded to Plaintiffs shall be diminished in proportion to the amount of fault attached to Decedent and/or others.

28. AS FOR A TWENTY-EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that it shall only be responsible for damages, if any, in an amount determined pursuant to and in accordance with Proposition 51 (Civil Code § 1431.2).

29. AS FOR A TWENTY-NINTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Decedent had full knowledge of all the risks, dangers, and hazards, if any there were, and nevertheless voluntarily and with full appreciation of the amount of danger involved in his actions and the magnitude of the risk involved, assumed the risk of injuries and damages to himself.

30. AS FOR A THIRTIETH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the matters complained of by Plaintiffs, if committed by Defendants' and/ir their employees, were consented to by Decedent.

31. AS FOR A THIRTY-FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that it is entitled to a setoff or offset against any award for any and all amounts

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

paid or payable to or on behalf of Plaintiffs or Decedent from any collateral or other source in connection with the matters alleged in the Complaint.

32. AS FOR A THIRTY-SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Plaintiffs' claims are barred, in whole or in part, by the doctrines of waiver, estoppel, laches, and unclean hands.

33. AS FOR A THIRTY-THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that other state and federal immunities may apply and are incorporated herein as well.

34. AS FOR A THIRTY-FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that at or about the time of the alleged event, the Defendants (and/or the involved individually named police officers) was/were presented with and had in their possession sufficient facts to constitute reasonable suspicion for a detention and/or probable cause for the arrest of Decedent and/or probable cause to take him into custody for a mental health evaluation, though the investigation was not complete at the point Decedent became an imminent deadly threat towards officers.

35. AS FOR A THIRTY-FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that Decedent, himself, was violent, threatening, used a harrowing gesture and/or was furtive towards the Defendant officers and the Defendant officers acted lawfully and/or in self-defense in relation to the use of force and in good faith.

36. AS FOR A THIRTY-SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that because Plaintiffs' Complaint is couched in conclusory terms, Defendants cannot fully anticipate all affirmative defenses that may be applicable to this matter. Accordingly, the right to assert separate affirmative defenses, if and to the extent such affirmative defenses are applicable, is here reserved, as information is discovered in this ongoing litigation, and Defendants have pled these affirmative defenses without knowing all the information about these issues.

## VIII. **PRAYER FOR RELIEF**

WHEREFORE, Defendants pray for the following relief:

a. That Plaintiffs take nothing by way of their Complaint herein;

b. For costs of suit;

c. For attorney's fees;

d. For such further relief as this Court may deem just and proper.

The undersigned attests that permission in the filing, service and/or execution of this document(s) has been obtained from the signatory below which shall serve in lieu of the actual signatures on the document(s).

Dated: September 8, 2026

MCNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP

By: /s/ Noah G. Blechman
Noah G. Blechman
John J. Swafford
Attorneys for Defendants
CITY OF ANTIOCH, JAKE MERRILL; ALEJANDRO LORONO; and MARCOS MOLINA

McNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
ATTORNEYS AT LAW
3480 BUSKIRK AVENUE, SUITE 250, PLEASANT HILL, CA 94523
TELEPHONE: (925) 939-5330

# EXHIBIT A

Diana Becton

District Attorney

Report of the Law Enforcement Involved Fatal Incident of David Wali Bahrami on June 30th, 2025

**Table of Contents**

Privacy Statement....3

Executive Summary....4

Introduction....6

Investigation....7

Notification and Assignments....7

Evidence Reviewed....8

Scene Description....8

Relevant Body Worn Camera....8

Evidence Scene Recovery.... 15

Review of 911 Calls and Phone Records....17

Video Surveillance from Nearby Residences....19

Drone Surveillance Footage....23

Record check of Information Conveyed to Officers Regarding BAHRAMI's Background. 24

Antioch Police Dispatch Computer Aided Dispatch log....24

Interviews of Involved Police Officers....26

Interviews of EMS/Medical Personnel....38

Interviews of Civilian Witnesses....39

Autopsy .... 41

Legal Principles ....42

Legal Analysis....48

Conclusion....52

## **Privacy Statement**

This report includes redactions of the names and other identifying information of victims, witnesses, and family members. Specific addresses are also not provided in this report. The public interest in such information is limited as it is not necessary to gain an understanding of the incident. Thus, the interest in nondisclosure clearly outweighs any public interest in disclosure.

For reasons related to privacy, as well as the readability of this report, the witnesses will be indexed as follows:

- Witness 1 (W1): Refers to David Bahrami's sister.
- Witness 2 (W2); Refers to David Bahrami's brother.
- Witness 3 (W3): Refers to David Bahrami's father.
- Witness 4 (W4): Refers to David Bahrami's mother.

- Location #1 (L1): Refers to David Bahrami's residential address in the City of Antioch.

## **Executive Summary**

On June 30th, 2025, at approximately 6:16 am, the Antioch Police Department Dispatch Center received a 911 call from a man who was later identified as David Bahrami [hereinafter BAHRAMI]. BAHRAMI had a history of mental illness and lived with his family at a residence in the City of Antioch. BAHRAMI told dispatch, "Hi, I'm about to kill someone" and provided his address. Dispatch asked BAHRAMI what his name was, and he responded, "I don't have a name," and hung up the phone.

Due to the unusual nature of the call, Antioch Police Officer Michael Drace obtained the phone number of the caller and made multiple, unsuccessful attempts to contact the individual. Shortly after 7:05 am, Officer Drace noticed that he had missed multiple return calls from the associated phone number.

At approximately 7:07 am, BAHRAMI called dispatch a second time and said he was about to kill someone. BAHRAMI asked how far away the officers were and told dispatch that his family was inside the home. BAHRAMI hung up the phone when asked to provide his name.

Multiple Antioch Police officers were assigned to the call and staged approximately four blocks from BAHRAMI's residence. By design, the staging allowed officers time to gather additional information and develop a coordinated tactical response to a potentially dangerous situation.

At approximately 7:15 am, BAHRAMI called Antioch dispatch for the third time. During the call, BAHRAMI asked when police would come to his house and how many police officers were responding to his location. BAHRAMI stated that he did not have any weapons and no one was with him. BAHRAMI ended the call when asked his name.

Officers at the staging area called BAHRAMI over the phone in order to establish a direct line of communication and deescalate the situation. BAHRAMI answered his phone and provided his name. BAHRAMI told police that he wanted officers to come quickly and questioned why it was taking so long for police to respond. BAHRAMI said his family was inside the residence, prompting officers to ask BAHRAMI if his family could come outside. BAHRAMI said his family could not come outside and later stated that they were sleeping.

At approximately 7:40 am, BAHRAMI told police he was going to kill his neighbor if the officers did not come to his house. Officers asked BAHRAMI why he wanted to harm his neighbor. BAHRAMI did not provide a reason as to why he wanted to harm his neighbor, but stated there was an emergency and he needed police to respond.

In response to BAHRAMI threatening to kill his neighbor, officers on scene told BAHRAMI they were nearby and asked him to come outside. They did this to de-escalate the situation and draw him away from family members who could be harmed inside the home.

Prior to making physical contact with BAHRAMI, Sgt. Mathew Mulholland gave officers on scene assigned roles. Officer Jake Merrill was designated as the contact officer responsible for communicating with BAHRAMI and, if necessary, physically restraining him. Officer Alejandro Lorono was equipped with a tactical shield and was designated as a lethal force option. Officer Marcos Molina was equipped with a 40 mm launcher[1] and was designated as a less-lethal option.

At or near that time, BAHRAMI exited his residence and walked towards the location of the police officers, which was approximately four houses away. A nearby Antioch Police video surveillance drone operator saw BAHRAMI exit the home via a live video feed. The drone operator advised officers that BAHRAMI left the home, but did not appear to be armed.

BAHRAMI approached the officers and was ordered to stop and get on his knees. Instead of complying, BAHRAMI pulled out a large kitchen knife. With the knife held in his right hand, BAHRAMI began running in front of the police officers. In an effort to stop BAHRAMI, Officer Molina fired a single less-lethal round, which appeared to have no effect.

BAHRAMI continued running in a semi-circular path, closing the distance in front of the officers. As BAHRAMI continued to run with the knife in his hand, he changed course, and ran toward the police. When BAHRAMI was approximately 15–20 feet away, Officers Lorono and Merrill opened fire, discharging their semi-automatic firearms a total of twenty times. BAHRAMI sustained multiple gunshot injuries and fell to the ground with the knife still in his hand.

Officers then ordered BAHRAMI to drop the knife. When BAHRAMI did not drop the knife, Officer Molina fired a second less lethal round at him. BAHRAMI continued to maintain possession of the knife until Officer Molina approached and kicked the knife away.

Officers immediately began administering medical aid, but BAHRAMI passed away while on scene. On July 3rd, 2025, an autopsy was conducted on BAHRAMI by Doctor Alex Blank. BAHRAMI's cause of death was listed as "gunshot wounds."

In applying the law and the California District Attorney's Uniform Crime Charging Standards to the present case, Officer Merrill, Officer Lorono, and Officer Molina acted in lawful self-

---

[1] A 40 mm launcher is a less-lethal device designed to incapacitate or deter a person without causing fatal injuries.

defense/defense of others and their use of force was reasonable under the circumstances. As such, no further action will be taken in this case.

**INTRODUCTION**

This report is the final step in the CCCDAO investigation of the Antioch Police Department's officer involved fatal incident of David Wali BAHRAMI on June 30th, 2025. The CCCDAO and every law enforcement agency in Contra Costa County follows the Law Enforcement Involved Fatal Incident Protocol ("the Protocol")[2] when investigating incidents where officers or civilians are shot, killed, or die during an encounter with law enforcement. Under the Protocol, the CCCDAO investigates all in-custody deaths in Contra Costa County for the purpose of making an independent determination of criminal liability. The sole purpose of the District Attorney investigation is to determine if there is proof beyond a reasonable doubt that an individual involved in the law enforcement involved fatality committed a crime.

Pursuant to the Protocol, immediately after an in-custody death, the involved law enforcement agency is required to notify the appropriate district attorney personnel. Once notified, trained and experienced members of the District Attorney's Office respond to the scene and begin the criminal investigation. In addition, criminal investigators from the law enforcement agency involved in the incident and from the jurisdiction where the incident occurred, if different, respond to the scene as well. It is important to note that although these investigations happen simultaneously, each agency conducts its own independent investigation.

As part of the criminal investigation, law enforcement officers and civilians who witnessed the incident may be interviewed. Evidence is collected at the scene and may be submitted to the county crime lab for testing and analysis, in addition to any other relevant investigative work necessary to complete the investigation. The Contra Costa County Sheriff's Office Crime Lab responds to every incident and is responsible for evidence collection of all in-custody deaths.

During the course of the criminal investigation, an officer or deputy has the right to be represented by an attorney. They may voluntarily choose to provide a statement, physical evidence, or other relevant information during the criminal and administrative investigations. Under the law, neither an officer nor civilian can be compelled to give a statement as part of a criminal investigation. However, an officer may be compelled to provide a statement during the law enforcement agency's administrative investigation only. (See, Public Safety Officers

---

[2] Contra Costa County was one of the first counties in the country to adopt a fatal incident protocol between the District Attorney and the law enforcement agencies within the county. The complete LEIFI protocol document can be located on the Contra Costa County District Attorney's Office website.

Procedural Bill of Rights Act, Government Code sections 3300 et seq.) In accordance with the law, the CCCDAO does not participate in compelled administrative investigation interviews and does not review them as part of the independent criminal investigation. There are very narrow circumstances where an exception to this rule is allowed.

## INVESTIGATION

### Notification and Assignments:

On June 30th, 2025, the Contra Costa County District Attorney's Office [hereinafter CCCDAO] was notified that the Antioch Police Department [APD] invoked the protocol for an officer involved fatal incident.

Members of the District Attorney's Office, as well as personnel from the Antioch Police Department, responded to the scene of the fatal incident [location #1]. Lieutenant Inspector Eddie Sousa, Senior Inspector Steve Cheatham, Senior Inspector Ann Shiraishi, Senior Inspector John Garcia, Senior Inspector Peter Folena, Senior Inspector Kevin Giacoletto, and Contra Costa County Chief Assistant District Attorney Simon O'Connell responded to the LEIFI incident.

The scene at location #1 was physically guarded by law enforcement personnel and the entire surrounding area was marked off with crime scene tape to aid in the preservation of physical evidence. The CCCSO Forensics Division (Crime Lab) was notified and arrived on scene to document their findings and collect evidence. The CCCDAO investigative team joined the APD detectives for a joint briefing which provided an overview of the incident to ensure that everyone with an active role in the investigation had all of the relevant information.

The following CCCDAO personnel were assigned to investigative teams with specific investigative tasks:

Senior Inspector Steve Cheatham[Lead Investigator CCCDAO]:
Conduct interviews of Sgt. Matthew Mulholland, Officer Marcos Molina, Officer Jake Merrill, and Officer Alejandro Lorono.

Senior Inspector Ann Shiraishi:
Conduct Interviews of BAHRAMI's family.

Senior Inspector John Garcia:
Observe collection of evidence and processing of involved law enforcement officers.

Senior Inspector Peter Folena:

Conduct Interviews of Officer Kyle Armstrong and Officer Joshua Pachan.

Senior Inspector Kevin Giacoletto:
Conduct Interview of Officer Joseph Amiri.

**Evidence Reviewed:**

- The scene of the fatal incident, located in Antioch California.
- Antioch Police Department reports associated with this incident.
- CCCDAO Investigative reports associated with this incident.
- Contra Costa County Crime Lab reports associated with this incident.
- Body worn camera footage.
- Dash camera footage.
- Drone camera footage.
- Video Camera footage from L#1 and nearby residences.
- Involved officer interviews.
- Witness interviews.
- Evidence collected during the investigation.
- Coroner's Report.
- 911 Call/Radio Traffic.
- CAD Logs.
- Additional investigative duties conducted.

## SCENE DESCRIPTION:

**Location of Scene:**

The scene of the fatal shooting was located in a residential neighborhood in the City of Antioch. The neighborhood consisted of single-family dwellings with sidewalks located on both sides of the street. The fatal incident occurred at the far south side of the street where the road bends north.

## RELEVANT BODY WORN CAMERAGE FOOTAGE:

Members of the Antioch Police Department patrol and traffic divisions are provided with Body Worn Cameras (BWC). All available BWC footage was collected and reviewed. The BWC footage for the involved officers was consistent with each other and included the date, times, and movements of the officers during the fatal incident.

The following is a summary of what was captured on BWC footage from multiple police officers, beginning with Officer Merrill's phone call to BAHRAMI placed at 7:29:58:

**07:29:58** Officer Merrill called BAHRAMI over the phone from a nearby staging area.

**07:30:10** Officer Merrill asked BAHRAMI if there was anyone else inside the house with him. BAHRAMI told Officer Merrill his family was inside and there were six people in total.

**07:30:18** Officer Merrill asked BAHRAMI if his family could come outside, to which BAHRAMI responded, "No." Officer Merrill asked why they could not come outside and BAHRAMI replied, "No."

**07:30:58** BAHRAMI told Officer Merrill he did not have any weapons.

**07:31:27** Sgt. Mulholland arrived at the staging area and advised officers to move to a nearby second staging area.

**07:31:30** Officer Merrill remained on the phone with BAHRAMI while driving to the second staging area. During their conversation BAHRAMI told Officer Merrill he was bleeding from his arm, which he accidentally cut when he fell. Officer Merrill asked BAHRAMI what he cut himself with, but BAHRAMI said he could not describe what he cut himself with.

**07:34:55** Officer Merrill asked BAHRAMI if he wanted medical personnel to help him with his injury. BAHRAMI replied, "No."

Officer Merrill asked him why not and BAHRAMI replied, "I need cops."

Officer Merrill stated, "I know you need cops David."

BAHRAMI replied, "You are enough to do the job."

Officer Merrill asked, "What job do you want to be done?" BAHRAMI did not answer the question.

**07:36:23** Officer Merrill asked BAHRAMI how many police officers he wanted to respond. BAHRAMI replied, "Four." Officer Merrill told BAHRAMI it would take another 5 minutes to get additional officers.

BAHRAMI asked if Officer Merrill would show up first. Officer Merrill asked BAHRAMI why he wanted him to show up first, but BAHRAMI did not answer the question.

Officer Merrill asked BAHRAMI if he could talk to his family. BAHRAMI responded that he could not talk to his family because they were asleep.

**07:37:20** Officer Merrill continued to talk to BAHRAMI. BAHRAMI repeatedly stated that he wanted Officer Merrill to come to his location as soon as possible.

**07:39:25** BAHRAMI hung up the phone.

**07:39:40** Officer Merrill called BAHRAMI. BAHRAMI repeatedly stated that there was a 9-1-1 emergency. Officer Merrill asked why he believed there was an emergency, but BAHRAMI did not provide an answer.

**07:40:51** BAHRAMI told Officer Merrill, "I'm going to kill my neighbor." Officer Merrill said he could not hear BAHRAMI and asked him if he said he wanted to hurt his neighbor.

**07:41:03** BAHRAMI said, "Yes, I'm going to harm my neighbor."

**07:41:08** BAHRAMI said, "The neighbor is outside and if you don't show up, I'm going to hurt my neighbor," to which Officer Merrill asked, "Why? What did your neighbor do?" BAHRAMI responded, "I don't know."

**07:42:02** BAHRAMI told Officer Merrill he had an emergency and needed him to respond.

**07:42:12** Officers arrived at the second staging area east of the residence. Officer Merrill told BAHRAMI he was on scene but that they couldn't see BAHRAMI.

**07:42:37** Officer Merrill told BAHRAMI to come outside and sit on the curb. Moments later, Officer Merrill told BAHRAMI to walk to the officers who were located at the nearby street corner.

**07:42:44** Prior to BAHRAMI reaching their location, Sgt. Mulholland made assignments for the contact team. He pointed at Officer Lorono and assigned him as a lethal force option. Officer Merrill was assigned as the officer to issue orders and to use his hands during the encounter. Officer Molina, who was equipped with the 40mm launcher, was assigned the less lethal option. Sgt. Mulholland advised

the officers on scene that he would provide assistance during the encounter.

**07:42:57** Officer Lorono told officers on scene that he could see BAHRAMI on the street.

**07:43:04** An Antioch Police Drone operator advised officers over the radio that BAHRAMI did not appear to have any weapons in his hands and was holding a cell phone.

**07:43:06** Sgt. Mulholland ordered Officer Lorono to retrieve the ballistic shield from his patrol car.

**07:43:08** An Antioch Police drone operator stated that BAHRAMI did not appear to have any weapons.

**07:43:09** Officer Lorono ran to his patrol car and retrieved a ballistic shield.

**07:43:18** Officer Merrill told BAHRAMI over the phone to walk to their location at the corner.

**07:43:23** Sgt. Mulholland requested dispatch to stage medical nearby.

**07:43:28** BAHRAMI hung up on Officer Merrill and walked towards the officers' location.

**07:43:36** Officer Lorono returned to the staging area with a ballistic shield.

**07:43:46** BAHRAMI came into view on Officer Lorono's body worn camera. BAHRAMI walked toward the officers' location.

**07:43:53** Sergeant Mulholland told Officer Merrill to start giving BAHRAMI commands.

**07:43:55** Officer Merrill told BAHRAMI to stop.

**07:43:57** Officer Lorono advised Officer Merrill to order BAHRAMI to walk past a nearby SUV which was blocking their view. Officer Merrill directed BAHRAMI to keep walking towards them.

**07:44:03** BAHRAMI walked past the SUV, at which point Officer Merrill ordered BAHRAMI to stop again. BAHRAMI stopped walking and his hands could be seen next to his sides.

**07:44:07** Officer Merrill ordered BAHRAMI to kneel on the ground, but BAHRAMI did not

follow Officer Merrill's command.

**07:44:09** BAHRAMI reached his right hand to his right waist band, at which point Officer Molina pointed the 40mm less-lethal device at BAHRAMI. Officer Lorono simultaneously pointed his firearm at BAHRAMI. Sgt. Mulholland drew his firearm.

**07:44:12** BAHRAMI began to run with the knife in front of the officers. Sergeant Mulholland ordered Officer Molina to fire his less lethal round at Bahrami.




**Photo from Sgt. Mulholland's BWC showing (S) David Bahrami running with a knife in front of the officers 6/30/25 07:44:13**

**07:44:14** Officer Molina fired the 40mm round at BAHRAMI, but it did not appear to have any effect. BAHRAMI continued to run with the knife in his hand and closed the distance between himself and the officers by running in a diagonal direction in front of the officers.

**07:44:15** Officer Merrill pulled out his gun while BAHRAMI continued to run diagonally towards the officers.




**Still shot from Officer Merrill's BWC at 07:44:15 depicting BAHRAMI running with the knife**

**07:44:16** Sgt. Mulholland advised dispatch BAHRAMI had a knife.

**07:44:17** BAHRAMI turned towards the officers with the knife and continued to close the distance. Officers Merrill and Lorono fired their semi-automatic handguns at BAHRAMI.


1

**Still shot image from Officer Lorono's BWC of BAHRAMI closing in on officers with a knife in his hand. The arrow indicates the location of knife. 06/30/25 07:44:17.**



**Still shot from Officer Merrill's BWC 07:44:17 of BAHRAMI after 1st shots are fired. The red arrow shows the knife in Bahrami's right hand.**

**07:44:19** BAHRAMI fell to the ground.

**07:44:20** Officers stopped firing and began issuing multiple commands for BAHRAMI to drop the knife. BAHRAMI maintained possession of the knife in his hand.

**07:44:38** Sergeant Mulholland ordered Officer Molina to fire a second round of the 40mm less lethal launcher.

**07:44:41** Officer Molina yelled, "40, 40, 40" and fired the second 40mm less lethal round. BAHRAMI did not drop the knife.

**07:44:45** Officer Armstrong announced he was going to fire his taser at BAHRAMI. The taser malfunctioned and did not fire.

**07:45:08** Officer Molina approached BAHRAMI and kicked the knife out of his hand.



**Still shot image from Sgt. Mullholland's BWC of Officer Molina kicking knife out of Bahrami's grasp. The arrow depicts location of the knife after it was kicked away. 06/30/25 07:45:08.**

**07:44:10** Sergeant Mulholland ordered the officers to handcuff BAHRAMI and start life saving measures. Seconds later, officers began rendering aid.

**Evidence Scene Recovery:**

Evidence recovery and documentation was completed by the Contra Costa County Sheriff's Office Crime Lab. During a walkthrough of the scene BAHRAMI was lying on his back. He was wearing pajama pants, Crocs, and his shirt appeared to have been cut open by medical personnel.

Numerous items of evidence were collected and/or photographed. Listed below is a summary of the relevant items recovered on scene:

1) One 40 mm less lethal launcher.
2) One handheld ballistic shield.
3) One large kitchen knife with a black handle.
4) Multiple medical devices which were used during attempted life saving measures.
5) Twenty (20) fired 9mm cartridge casings.
6) Two fired less lethal foam projectiles, and their respective spent casings.
7) A cell phone.



***The above image was from drone footage of the surrounding area.***
***The red arrow indicates the location of BAHRAMI's residence***
***The red circle indicates the location of the fatal incident.***




***The above image was taken at the location of the fatal shooting. This photo illustrates the law enforcement equipment, items used for medical aid, and the knife recovered from BAHRAMI. Evidence placards were positioned near each item of evidence.***




***The above photograph depicts the knife recovered on scene while positioned next to a tape measuring device.***

**Review of 911 Calls and Phone Records**

During the fatal incident, BAHRAMI called Antioch Dispatch on three separate occasions.

The First Call to 911 at 6:16 am [and 50 seconds]:

> During the call BAHRAMI told the 911 operator, "I'm about to kill someone" and gave his address at location #1. BAHRAMI refused to provide his name and ended the call.
>
> *The call was approximately 42 seconds long.*

The Second Call to 911 at 7:07 am [and 57 seconds]:

> During the call BAHRAMI appeared upset that police had not yet arrived at his location. BAHRAMI told the 911 operator he had waited for 40 minutes, and needed the police at his address. BAHRAMI stated, "I am about to kill someone, where are the cops?" BAHRAMI told the 911 operator he lived at location #1. BAHRAMI further stated that he was at the location with his family and hung up the phone.
>
> *The call was approximately 1 minute and 16 seconds long*.

The Third Call to 911 at 7:15 am [and 39 seconds]:

> During the call BAHRAMI wanted to know where the police officers were and told the dispatcher his address. The 911 operator told BAHRAMI officers were driving to his residence. BAHRAMI told dispatch he did not have any weapons, and no one was with him. The 911 operator asked BAHRAMI for his name. BAHRAMI ended the phone call without providing a name.
>
> *The call lasted approximately 1 minute and 7 seconds.*

A review of the relevant Antioch Police Department Police reports revealed that shortly after BAHRAMI's initial 9-1-1 phone call to dispatch, Antioch Police Officer Drace became aware of the call. Office Drace obtained the phone number of the caller and dialed the caller's phone number to get additional details due to the unusual nature of the call. Officer Drace called BAHRAMI's phone number twice at 6:19 am, but no one answered the call.

Cell Phone Records:
The cell phone recovered at the scene was examined to determine incoming and outgoing calls made by BAHRAMI. Listed below is a history of the relevant times and callers:

| | |
|---|---|
| 6:13:43 | Outgoing call by BAHRAMI to 911 [42 secs] |
| 6:19:38 | Incoming missed call from Antioch Police Officer Drace |
| 6:19:57 | Incoming missed call from Antioch Police Officer Drace |
| 6:54:21 | Outgoing call from BAHRAMI to Antioch Police Officer Drace [9 secs] |
| 6:55:31 | Outgoing call from BAHRAMI to Antioch Police Officer Drace [9 secs] |
| 7:05:36 | Outgoing call from BAHRAMI to Antioch Police Officer Drace [9 secs] |
| 7:07:30 | Outgoing call by BAHRAMI to 911 [1 minute 16 secs] |
| 7:14:21 | Outgoing call by BAHRAMI to 911 [1 minute 7 secs] |
| 7:18:36 | Incoming call from Antioch Police Officer Merrill [1 minute 19 secs] |
| 7:29:56 | Incoming call from Antioch Police Officer Merrill [9 minutes 26 secs] |
| 7:39:34 | Incoming call from Antioch Police Officer Merrill [3 minutes 53 secs] |
| 7:43:45 | Incoming missed call from Antioch Police Officer Merrill |

**SEARCH WARRANT OF LOCATION #1.**

As part of the LEIFI investigation, officers obtained a search warrant to look for relevant evidence inside the home. Various items were located in BAHRAMI's bedroom and seized, including laptops, a cell phone, empty pistol holsters, and medications. No firearms were located inside the residence. An empty rifle case was located in an outside garbage can.

**VIDEO SURVEILLANCE RECOVERED FROM NEARBY RESIDENCES:**

During the investigation, video evidence was collected from multiple residences which were equipped with home surveillance systems. The videos were reviewed and appeared consistent with the officers' body worn camera footage referenced above.

A sequence of still shot images recovered from a nearby residence is listed below. The video/s were date stamped 06/30/25. The time stamp on the video/s varied by a matter of seconds from those depicted in available body worn camera footage.



**Still shot image from a nearby surveillance video depicting BAHRAMI stopped at the rear of a parked SUV with his arms to his sides, prior to the shooting.**
**Red arrows indicate the positions of BAHRAMI and the APD Officers.**



**Still shot image from nearby surveillance video depicting BAHRAMI as he started to run with the knife after pulling it from of his waistband.**
**Red arrow indicates (S) Bahrami moving away from the SUV and toward APD Officers.**



**Still shot image from nearby surveillance video depicting BAHRAMI as he continued to run with the knife. Red arrows indicate the positions of BAHRAMI and Police Officers**



**Still shot image from nearby surveillance video depicting BAHRAMI as he continued to run with the knife in his hand. Red arrows indicate BAHRAMI/Officers' positions**



**Still shot image from nearby surveillance video capturing when officers first opened fire.**




**Still shot image from nearby surveillance video capturing when BAHRAMI fell to the ground.**

**Drone Surveillance Footage**

Listed below are multiple still shot images from the Antioch Surveillance Drone utilized during this incident. The position of the officers is obstructed by a tree located near a residence. A red circle has been included in the images to represent the approximate location of the officers on scene.



**Image 1:**
**BAHRAMI's position moments after pulling out the knife and running (Yellow circle)**



**Image 2:**
**BAHRAMI's position as he ran in front of the officers**



**Image 3:**
**BAHRAMI's position after he appears to be shot [Yellow circle)**



**Image 4:**
**BAHRAMI's estimated position after falling to the ground, which is obstructed by a tree [Yellow circle)**

**Record Check of Information Conveyed to Officers Regarding BAHRAMI's Background:**

A subsequent search of the California Automated Firearms System search confirmed four handguns were registered to BAHRAMI at the time of the incident. In addition, a review of Antioch Police Records confirmed BAHRAMI was placed under a 5150 Welfare and Institution hold in December of 2024[3]. No additional details will be provided in this report regarding this incident due to the sensitive nature of this information and its' limited evidentiary value.

**Antioch Police Dispatch Computer Aided Dispatch log:**

**07:07:15** Officer Merrill, Officer Molina and Officer Lorono were dispatched to location #1.

**07:08:57** Dispatch advised, "RP called again.. Upset police aren't there yet.. Keeps asking how far away are they… Says he is there with family and then hung up".

**07:15:39** Dispatch advised, "RP called back asking when PD will arrive and how many, said he does not have any weaps [weapons] and no one else is in the house. HU [hung up] when asked his name".

**07:17:34** Officer Armstrong was dispatched to location #1 to utilize surveillance drone.

**07:18:07** Officer Merrill advised he was staged and attempting to contact the caller via phone.

**07:20:27** Officer Merrill advised he spoke to subject. Subject stated he has a knife and wants to kill someone.

**07:20:30** Sergeant Mulholland dispatched to location #1.

**07:20:35** Officer Molina advised he was enroute with a 40 mm less lethal launcher.

**07:21:47** Officer Molina advised the initial staging location was near location #1.

**07:23:50** Officer Armstrong advised he was on scene with his drone.

---

[3] Pursuant to Welfare and Institution code 5150 an individual may be placed under an involuntary psychiatric hold if they present as a danger to themselves or others.

**07:26:41** Officer Armstrong advised he deployed his drone.

**07:29:11** Officer Pachan dispatched to location #1.

**07:31:06** Sergeant Mulholland advised he was on scene at the staging area [].

**07:31:32** Officer Lorono advised, “A subject named David was on phone with Officer Merrill. David advised he was in front of house, at the curb. The drone confirmed there was no visual of David outside of house.”

**07:32:05** Officer Amiri was dispatched to location #1.

**07:33:24** Sergeant Mulholland advised he moved the staging area.

**07:36:08** Officer Pachan advised he arrived on scene.

**07:41:35** Officer Pachan advised he deployed his drone.

**07:42:22** Officers were advised, “Male walking out to sidewalk”.

**07:42:57** Officer Amiri advised he was on scene.

**07:43:50** Sergeant Mulholland requested a “Code 33” on the main radio channel

**07:44:20** Sergeant Mulholland advised “Shots Fired.”

**07:44:27** Sergeant Mulholland advised to “Stage Fire.”

**07:45:23** Officer Amiri advised they were providing life saving measures and to “Send in fire.”

**07:46:32** The location was updated for Contra Costa County Fire District (Con Fire).

**07:36:37** Officer Amiri advised he identified multiple gunshot wounds to BAHRAMI’s chest and arm.

**07:48:58** Officer Armstrong advised he identified two exit wounds to the subject’s back.

**07:49:41** Officer Armstrong advised Con Fire was on scene.

**07:51:59** Officer Armstrong advised CPR was started.

**07:56:01** Officer Molina advised subject was declared deceased.

## Officer Interviews:

### Interview of Antioch Police Officer Marcos Molina

Officer Marcos Molina was interviewed on July 2, 2025, by CCCDAO Senior Inspector Steve Cheatham and Antioch Police Detective John Cox in a conference room located at the Antioch Police Officer Association Office. Officer Molina was represented by Attorney Justin Huffington of Rains, Lucia, and Stern [RLS]. Officer Molina stated that he did not speak with anyone except Mr. Huffington regarding the incident and he did not view any body worn camera footage of the incident prior to being interviewed. A summary of Officer Molina's statement is listed below:

On 6/30/25 Officer Molina learned an unknown caller [later identified as BAHRAMI] contacted the Antioch Police dispatch. BAHRAMI said he had a knife and was going to hurt someone. While in briefing Antioch dispatch provided an update advising officers that BAHRAMI called back and asked when police were going to arrive at his location. Officer Molina thought BAHRAMI may have been experiencing mental health issues.

Officer Molina, Officer Merrill, and Officer Lorono responded to the call. Officer Molina reviewed notes associated with the call and learned BAHRAMI was previously taken into custody for a 5150 hold where weapons were confiscated during the incident. Due to this history, Officer Molina was concerned BAHRAMI may have access to additional weapons. Officer Molina was further concerned that BAHRAMI may be setting an ambush to attack the officers when they arrived on scene.

The responding officers decided to stage approximately four blocks away from location #1 and waited for Sgt. Mulholland to arrive. The purpose of staging away from the home was to gather more information and develop a tactical plan on how to contact BAHRAMI.

Officer Merrill called BAHRAMI on his telephone. BAHRAMI wanted to know why officers were not at his home yet and wanted them to hurry up. BAHRAMI repeatedly asked how many officers were responding to his location. BAHRAMI told the officers he had a knife and was going to hurt someone. BAHRAMI then shifted his account of events and told Officer Merrill he was bleeding and needed help. Officer Molina continued to believe BAHRAMI was attempting to set up an ambush on the officers.

Sergeant Mulholland arrived at the staging area and decided to move the staging area to a location east of the residence. At or near this time, Officer Armstrong and Officer Pachan arrived on scene, activated two video surveillance drones, and watched over the residence at location #1.

Officer Merrill asked BAHRAMI if his family was still in the house and BAHRAMI confirmed they were inside. In addition, BAHRAMI said he had blood on his arm. Officer Molina did not know if BAHRAMI had already hurt someone inside the house and he believed if they could get the family out of the home, BAHRAMI would be isolated and the situation could de-escalate.

The officers on scene discussed a plan where they would ask BAHRAMI to leave the home to separate him from any individuals inside. Officers could then take BAHRAMI into custody under a 5150 W&I hold where he could be transported to a mental health facility for treatment.

Officer Merrill asked BAHRAMI to come out of the house. BAHRAMI said he was outside, but the drone operators confirmed BAHRAMI was not outside.

Sergeant Mulholland created a contact team and assigned roles for each officer. Officer Molina was equipped with his 40 mm less lethal launcher. Officers Armstrong and Pachan were assigned to utilize the drones. Officers Lorono and Merrill were assigned as a lethal force option. Both Sgt. Mulholland and Officer Merrill were assigned to be a hands-on contact person.

BAHRAMI exited the home and Officer Merrill directed him toward their location. The drone operators advised officers that BAHRAMI appeared unarmed. Officer Merrill saw BAHRAMI walking towards their location. BAHRAMI approached a SUV parked at the curb west of their location, at which point Officer Merrill yelled for BAHRAMI to stop. BAHRAMI stopped, but Officer Molina's view was partially obstructed by the vehicle.

Officer Molina asked Officer Merrill to order BAHRAMI to walk further toward them. Officer Merrill issued the command and BAHRAMI walked further toward them. Officer Merrill ordered BAHRAMI to stop after he passed the SUV, which was approximately 30 feet from their location. At this point Officer Lorono was to his right and was equipped with a ballistic shield, while Officer Merrill was to his left.

Officer Merrill ordered BAHRAMI to show his hands and to lie on the ground. BAHRAMI stood still for approximately one second. BAHRAMI appeared to be zoned out and experiencing tunnel vision. BAHRAMI reached his right hand into his waistband and pulled out a large kitchen knife that was approximately eight inches in length. Officer Molina believed his suspicions about an ambush were confirmed and BAHRAMI was going to try to kill them.

BAHRAMI began to run horizontally in front of them. Officer Molina pointed his 40 mm launcher at BAHRAMI. Officer Molina announced he was going to fire by yelling 40, 40, 40. Officer Molina fired a 40 mm round at BAHRAMI and saw BAHRAMI reach for his right side. Officer Molina believed he hit BAHRAMI with the 40 mm round, but it did not stop him.

BAHRAMI changed direction, quickened his pace, and ran straight at them with the knife in his right hand with the blade pointed at them. Officer Molina backed up behind Officer Lorono and Officer Merrill and looked down to reload his 40 mm launcher. BAHRAMI continued to close the distance toward them. Officer Molina was scared BAHRAMI was going to stab and kill him with the knife. BAHRAMI was approximately ten feet away from them when he heard gunshots. Officer Molina did not see which officer opened fire because he was focused on BAHRAMI.

BAHRAMI fell to the ground with the knife in his hand. Officers yelled at him to drop the knife. BAHRAMI moved while on the ground but did not drop the knife. Officer Molina reloaded his 40 mm less lethal launcher and fired one more round at BAHRAMI. The round struck BAHRAMI in the abdomen, but did not appear to have any effect.

Officer Molina ran up and kicked the knife out of BAHRAMI's hand. Additional officers moved forward, and BAHRAMI was handcuffed. Officer Molina started medical aid on BAHRAMI by cutting open his shirt and applying chest seals and gauze to several injuries. Within minutes of setting the chest seals he began administering CPR. He continued rendering medical aid until he was told to stop by paramedics who responded to the scene.

Officer Molina was eventually ordered back to the station and sequestered pending the LEIFI protocol investigation.

**Interview of Antioch Police Officer Jake Merrill**

Antioch Police Officer Jake Merrill was interviewed on July 2, 2025, by CCCDAO Senior Inspector Steve Cheatham and Antioch Police Detective John Cox at the Antioch Police Officer Association Office. Officer Merrill was represented by Attorney Justin Huffington of RLS Legal Office. Officer Merrill stated that he did not speak with anyone except Mr. Huffington regarding the incident and he did not view any video footage of the incident prior to being interviewed. Listed below is a summary of his statement:

On 6/30/25, Officer Merrill was attending a patrol briefing when he was informed by dispatch of a caller who said they were going to kill somebody. Officer Merrill read the notes associated with the call and learned firearms were taken from the home on a prior occasion. Sergeant Mulholland requested Officer Merrill, Officer Molina and Officer Lorono to respond to the residence. All three officers staged at a nearby location.

Officer Merrill called the subject on his cell phone and learned the subject's name was David [BAHRAMI]. BAHRAMI adamantly told him that officers needed to respond quickly to his house and wanted to know why it was taking so long. Officer Merrill became suspicious as to why BAHRAMI wanted the officers to come to the house and suspected BAHRAMI intended to ambush the officers.

BAHRAMI repeatedly hung up on him. Officer Merrill called several times to continue to get information from BAHRAMI. Officer Merrill tried to determine from BAHRAMI if there were other people in the house with him, but BAHRAMI refused to give him any information about his family members. Officer Merrill became fearful BAHRAMI would hurt someone in his family.

At one point BAHRAMI said his neighbor was outside and he was going to go hurt his neighbor. Officer Merrill asked BAHRAMI to come outside of the house in an attempt to separate him from anyone inside the home. At one point, BAHRAMI told Officer Merrill he was outside his home, but surveillance drone operators advised officers that BAHRAMI was not outside the home.

During the incident, Sgt. Mulholland moved the staging area closer to location #1, but still out of sight of BAHRAMI's residence. After relocating the staging area, BAHRAMI exited his home. Officer Merrill asked BAHRAMI over the phone to walk to their location. BAHRAMI hung up the phone. Officer Merrill estimated that he was on the phone with BAHRAMI for approximately 10 minutes and repeatedly attempted to maintain communication in order to de-escalate the situation.

Sergeant Mulholland assigned the officers on scene various use of force options. Officer Molina was equipped with a 40 mm less lethal launcher. Officer Lorono was assigned as a lethal force option. Officer Merrill was assigned to give BAHRAMI commands and go hands on, if necessary.

BAHRAMI walked at a brisk pace toward their group. BAHRAMI appeared unarmed. BAHRAMI was ordered to stop once he approached a parked blue car. Sgt. Mulholland told Officer Merrill to tell BAHRAMI to come a little closer in order to get a better visual. Officer Merrill ordered BAHRAMI to come closer and then ordered him to get on the ground. BAHRAMI walked closer to their location and stopped. At this point, BAHRAMI was approximately 25 feet away from their location.

BAHRAMI quickly pulled out a large 6–8-inch kitchen knife from his waistband. After he pulled out the knife, Officer Molina fired a 40mm less lethal round at BAHRAMI. BAHRAMI flinched after being struck by the less-lethal round. BAHRAMI ran at them in a half circle and turned toward them. BAHRAMI held the knife in his right hand and was thrusting it in their direction. BAHRAMI continued running and at one point was approximately 10-15 feet away.

Officer Merrill feared for his safety because he believed BAHRAMI was going to stab him or another officer on scene. Officer Merrill fired his handgun at BAHRAMI approximately five to seven times. BAHRAMI fell to the ground. Approximately 3-5 seconds of time passed from when BAHRAMI pulled out the knife to when he was shot by police.

BAHRAMI continued to hold the knife in his hand while he was on the ground. Officer Molina approached BAHRAMI and kicked the knife away. BAHRAMI was handcuffed and officers began life saving measures. Paramedics arrived minutes later.

**Interview of Antioch Police Officer Alejandro Lorono**

Antioch Police Officer Alejandro Lorono was interviewed on July 2, 2025, by CCCDAO Senior Inspector Steve Cheatham and Antioch Police Detective John Cox at the Antioch Police Officer Association Office. Officer Molina was represented by Attorney Justin Huffington of RLS Legal Office. Officer Lorono stated that he did not speak with anyone except Mr. Huffington regarding the incident and did not view any body worn camera video footage prior to being interviewed. Listed below is a summary of his interview:

On 6/30/25 he was attending a patrol briefing when he became aware of a priority one call involving a subject [later identified as BAHRAMI] who stated he was going to hurt somebody. Officers Lorono, Molina, and Merrill took the call and while enroute, dispatch provided an update that BAHRAMI wanted to know when the officers were going to arrive at his location. BAHRAMI stated he had a knife and wanted to hurt people inside the home.

Officer Lorono believed he needed more resources sent to this call and requested a supervisor and a drone officer to respond to the incident. Officer Lorono advised responding officers to stop short of the address until more resources arrived on scene.

While waiting for additional resources Antioch Police dispatch updated the call. Dispatch informed officers BAHRAMI wanted to know how many officers were responding to the house and when they were going to arrive. Officers were further advised that BAHRAMI was taken into custody under Welfare and Institutions Code 5150 in 2024 and four guns were seized during this prior incident.

With these additional details, Officer Lorono was concerned BAHRAMI may currently have access to a firearm and that BAHRAMI may be trying to ambush the officers if they came to the house. Officer Lorono and Officer Molina discussed whether or not they should respond directly to the house if no one was inside the home, especially since BAHRAMI initially stated no one was in the home with him.

Officer Lorono believed they needed to confirm whether or not anyone in the home was in danger. During the staging, Officer Lorono was advised by another police officer, who responded to the prior 5150 W&I incident, that 4-5 people lived in the house with BAHRAMI.

While waiting for additional resources, Officer Merrill made contact with BAHRAMI over the phone. Officer Merrill confirmed with BAHRAMI that there were people inside the house. During the call, BAHRAMI further stated he was going to hurt his neighbor.

The officers' initial plan was to get the family members out of the house and isolate BAHRAMI inside the home. Officer Merrill asked BAHRAMI if he could talk to any other people inside the house, but BAHRAMI replied that his family was asleep and refused to wake anyone up. Additional officers at the staging area attempted to obtain phone numbers for family members in the home.

Officer Merrill asked BAHRAMI to come outside after he refused to wake up family members. The purpose of asking BAHRAMI to come outside was to separate him from the individuals inside the residence. BAHRAMI told officers he was in front of his house, but drone operators advised there was no one outside the home.

Sergeant Mulholland designated a contact team amongst the officers who were on scene. Officer Molina was assigned the 40 mm less lethal launcher. Officer Merrill was assigned as the contact officer who would go hands on with BAHRAMI if needed. Officer Lorono was assigned as lethal force option. Sergeant Mulholland assigned himself the role of secondary contact.

Antioch drone operators advised the officers on scene that BAHRAMI exited the home and saw a phone in his hands. Officer Merrill directed BAHRAMI to their location east of his house. BAHRAMI looked in their direction, put his phone in his pocket, and walked toward them. Officer Merrill gave BAHRAMI voice commands as he walked closer to the officers. BAHRAMI walked by a blue SUV, at which point Officer Merrill told him to stop and get on the ground.

BAHRAMI stopped walking, reached into his waistband, and pulled out a 10 -12-inch knife. BAHRAMI ran toward them with the knife pointed at the ground. Seargent Mulholland ordered Officer Molina to deploy the 40 mm launcher. Officer Molina fired the 40 mm round at BAHRAMI, which hit him in the left hip upper thigh area. BAHRAMI winced but kept moving.

BAHRAMI immediately turned his body toward the officers and ran at them with the knife in hand. BAHRAMI was approximately fifteen to twenty feet away when he turned toward him. Officer Lorono pointed his gun at BAHRAMI's torso as he closed the distance between them. Officer Molina retreated behind Officer Lorono to reload his 40 mm less-lethal launcher.

Officer Lorono thought BAHRAMI was going to stab and kill him or one of the other officers when he continued to run toward them. In response, Officer Lorono fired his gun at BAHRAMI seven to eight times. Officer Lorono fired two more times as BAHRAMI closed in on him and started to fall to the ground. BAHRAMI was approximately five to six feet when BAHRAMI fell to the ground.

BAHRAMI kept the knife in his hand once he fell to the ground and was pointing the knife up at the officers. Officers repeatedly ordered BAHRAMI to drop the knife, but he did not obey the commands. Seconds later BAHRAMI's hand slowly fell to the ground. Officer Molina stepped forward and kicked the knife out of BAHRAMI's hand. The officers approached BAHRAMI, handcuffed him and began rendering medical aid.

During this incident Officer Lorono briefly thought of using other less lethal options, such as a taser or pepper spray, but due to the time, distance, and how quickly BAHRAMI reacted, those options were not feasible.

Officer Lorono was eventually ordered back to the police station and sequestered.

**Interview of Antioch Police Sergeant Matthew Mulholland**

On June 30, 2025, at approximately 1225 hours Antioch Police Sergeant Matthew Mulholland was interviewed by CCCDAO Senior Inspector Steve Cheatham and Antioch Police Detective John Cox in a conference room located at the Antioch Police Department. Listed below is a summary of his statement:

On June 30, 2025, at approximately 6:20 am, Sgt. Mulholland became aware of a call received by Antioch Police dispatch. The caller, later identified as BAHRAMI, told dispatch he was going to kill somebody and provided his address. Sergeant Mulholland learned of officer safety information attached to the address, which noted an occupant of the home was hostile to police officers on a prior occasion and several firearms were seized from the residence.

Sergeant Mulholland conducted a briefing with his patrol shift. During the briefing BAHRAMI called Antioch Police dispatch for a second time, at which point Sgt. Mulholland sent Officer Molina, Officer Lorono, Officer Merrill and Officer Armstrong to respond to the call. The officers arrived at a staging area several blocks away from the home and Officer Armstrong deployed a video surveillance drone to attempt to gather video footage from above the residence.

Sergeant Mulholland listened to radio communications from the officers on scene. Sgt. Mulholland was advised that Officer Merrill made phone contact with BAHRAMI. Officer Merrill provided dispatch with updates regarding the information he gathered during the call. During

the updates Sgt. Mulholland learned BAHRAMI was continuing to threaten to kill someone and was potentially armed with a knife.

Sgt. Mulholland responded to the staging area. Sgt. Mulholland ordered officers to move to a second staging area closer to the residence because he believed they were too far away from the home. In addition, Sergeant Mulholland requested dispatch to have both the fire department and an ambulance staged nearby.

While at the staging area Sgt. Mulholland intermittently listened to the phone conversation between Officer Merrill and BAHRAMI. Sgt. Mulholland heard BAHRAMI ask when officers would be at his house and stated that there was an emergency. In addition, BAHRAMI said family members were in the home, and he heard BAHRAMI state that he was going to kill someone.

Based on the information available to him, Sergeant Mulholland was concerned that BAHRAMI was trying to commit "suicide by cop[4]". Additionally, Sgt. Mulholland believed there were public safety concerns because there were other individuals inside the house that could be hurt or killed.

At this point Sgt. Mulholland decided to isolate BAHRAMI by having him exit the house and walk to their location. Sgt. Mulholland believed if BAHRAMI was far enough away from the house he would not be able to run back inside and create a barricaded subject scenario.

Sgt. Mulholland quickly devised a plan. He designated himself and Officer Merrill to issue commands to BAHRAMI and to use their hands, if necessary, to take him into custody. Officer Lorono would equip himself with a ballistic shield. Lastly, Officer Molina would be equipped with the 40 mm less lethal launcher.

Sergeant Mulholland heard BAHRAMI tell Officer Merrill he was on his driveway, but drone operators confirmed there was no one in front of the house. BAHRAMI eventually exited the house and came out to the sidewalk. Drone operators advised officers that BAHRAMI was holding a cell phone and did not appear to have any weapons.

Officer Merrill told BAHRAMI to walk to their location. Sgt. Mulholland watched BAHRAMI walk to a nearby corner and stop.  BAHRAMI passed a blue SUV parked on the street, at which point BAHRAMI reached his right hand into his waistband and pulled out a knife with an 8–10-inch blade. BAHRAMI charged at the officers, who ordered him to stop and drop the knife. Officer

[4] "Suicide by cop" is a term used to describe a situation where a person intentionally behaves in a threatening or deadly way towards law enforcement with the goal of provoking the officers to use lethal force against them.

Molina shot BAHRAMI with his 40 mm less lethal launcher, but BAHRAMI continued to close in on the officers with the knife pointed at them.

At this point Sgt. Mulholland was afraid BAHRAMI was going to stab and kill one of his officers. Officer Lorono fired his gun at BAHRAMI, who continued to close in on the officers as he was struck by the bullets. After numerous shots, BAHRAMI eventually fell to the ground. When BAHRAMI fell to the ground he was approximately 10-15 feet from the officers.

BAHRAMI continued to hold the knife in his hand, pointed at the officers as he was on the ground. During this incident Sgt. Mulholland believed Officer Molina fired a second 40 mm round at BAHRAMI. Sgt. Mulholland recalled an officer moved toward BAHRAMI and kicked the knife out of his hand. Sgt. Mulholland ordered officers to administer life saving measures and requested fire and ambulance to respond to his location.

**Interview of Antioch Police Officer Joseph Amiri**

On June 30, 2025, at approximately 1227 hours Antioch Police Officer Joseph Amiri was interviewed by Senior Inspector Giacoletto and Antioch Police Detective Robert Ibanez. Listed below is a summary of his statement:

On June 30, 2025, Antioch Police Officer Amiri was advised that multiple police officers were responding to an unknown threat call at location #1 and that Sergeant Mulholland requested additional officers to respond to a staging area near the scene.

Officer Amiri arrived at the staging area and saw Officer Armstrong get out of his nearby patrol vehicle and run toward officers on scene. Officer Amiri exited his patrol vehicle, activated his body worn camera (BWC), and ran after Officer Armstrong. Officer Amiri drew his handgun as he ran towards Sergeant Mulholland, Officer Molina, Officer Armstrong and Officer Lorono, who were standing nearby.

Officer Amiri heard several officers yell, “Drop the knife,” and “Stop.” Officer Amiri then heard what he thought were either gunshots or a 40 mm less lethal round being fired. Officer Amiri saw a subject [later identified as BAHRAMI] fall to the ground in front of the other officers.

Officer Amiri saw BAHRAMI holding a chef-style knife in his hand as he was laying on the ground. Officer Amiri yelled at the BAHRAMI to drop the knife. BAHRAMI moved with the knife in his hand and did not comply with his commands. Officer Amiri wanted to provide medical aid to BAHRAMI, but did not approach until he was disarmed. Officer Amiri radioed for medical aid to respond to the scene.

Sgt. Mulholland formulated a plan to approach BAHRAMI and remove the knife from his grasp. After the knife was removed BAHRAMI was placed in handcuffs. Officer Armstrong provided medical aid until Emergency Medical Services arrived on scene.

Officer Amiri was subsequently assigned evidence scene security duties. He secured the scene with crime scene tape, took photographs of the area, and performed additional duties.

**Interview of Antioch Police Officer Joshua Pachan**

On June 30, 2025, at approximately 1158 hours, CCCDAO Senior Inspector Peter Folena and Antioch Police Detective Cole Schaffer interviewed Officer Pachan at the Antioch Police Department. Officer Pachan stated that he did not speak with anyone about this incident and did not view any body worn camera video footage prior to being interviewed. Listed below is a summary of his statement:

On June 30th, 2025, Officer Pachan became aware of a pending high priority call while attending an Antioch Police briefing. Officer Lorono, Officer Merrill, and Officer Molina cleared briefing to respond to the call. Officer Pachan reviewed the notes associated to the call, which indicated that a subject [later identified as BAHRAMI] contacted the Antioch Police dispatch center, told dispatch he was going to kill someone, and wanted to know when officers were going to arrive at his location.

Officer Pachan drove to the call and staged nearby with additional police officers. Both Officer Pachan and Officer Armstrong were on scene and equipped with video surveillance drones. During the incident both Officer Pachan and Armstrong deployed their drones at various points to gather intel for the safety of the officers.

At one point Officer Armstrong noticed the battery to his drone was low, prompting Officer Pachan to take over drone duties. Officer Pachan was able to provide a panoramic view of the street near location #1 utilizing the drone camera.

Initially Officer Pachan did not see anyone in front of the residence at location #1, but minutes later he saw BAHRAMI come out of the front door with a cellular phone held up to his ear. BAHRAMI paced back in forth in the driveway and appeared agitated as he held the cell phone.

BAHRAMI walked east from his residence toward the officers staged nearby. Officer Pachan heard officers give BAHRAMI commands. While watching via his drone monitor, Officer Pachan saw BAHRAMI reach into his waistband and pull out a knife. Several officers ordered BAHRAMI to drop the knife. BAHRAMI continued toward the officers with the knife in hand and ignored commands to drop the knife. Officer Pachan heard ten or more gunshots and watched BAHRAMI fall to the ground.

Officer Pachan put his drone controls down and went to the scene so he could render aid to BAHRAMI. Officer Pachan saw BAHRAMI on the ground with the knife still in his hand. Officers ordered him to drop the knife. An officer on scene fired a 40 mm less lethal round at BAHRAMI to get him to drop the knife, which was ineffective. Another officer kicked the knife out of BAHRAMI's hand, but he was not sure which officer kicked the knife away.

After the knife was removed officers rendered medical aid to BAHRAMI. While the officers were rendering medical assistance a female approached the officers. The female identified herself as BAHRAMI's mother. BAHRAMI's mother was very upset. She wanted to know why the officers shot her son and asked if he was dead. Officer Pachan told the mother an ambulance was on the way. Another family member took the mother away from the scene.

**Interview of Antioch Police Officer Kyle Armstrong**

On June 30, 2025, at approximately 1048 hours, CCCDAO Senior Inspector Peter Folena and Antioch Police Detective Cole Schaffer interviewed Officer Kyle Armstrong at the Antioch Police Department. Officer Armstrong stated that he did not speak with anyone about this incident and did not view any body worn video camera footage of the incident prior to being interviewed. Listed below is a summary of his statement:

On June 30, 2025, Officer Armstrong was at an Antioch Police briefing when he noticed a priority call regarding a subject [later identified as BAHRAMI] who stated that he was going to kill somebody. The dispatcher attempted to call BAHRAMI back but received no answer.

Officer Merrill, Officer Lorono and Officer Molina were dispatched to the call. The dispatcher asked if a drone operator was available. Officer Armstrong, who was equipped with a surveillance drone, responded to dispatch that he was enroute.

Officer Armstrong drove to a staging area a few blocks away from the residence. While at the staging area Officer Armstrong launched his drone over location #1 but saw no activity outside the home.

During this incident Officer Armstrong recalled that he responded to location #1 on a prior occasion. BAHRAMI's family called the police because BAHRAMI made violent threats toward his family. BAHRAMI was eventually detained under a 5150 Welfare and Institution hold and several firearms were confiscated from the residence during this prior incident.

While conducting surveillance Officer Armstrong heard Officer Merrill contact BAHRAMI over the telephone. During the call BAHRAMI identified himself but would not let officers talk to his family to check on their safety. Officer Merrill asked BAHRAMI to exit his house and come out front. BAHRAMI replied that he left his house and was in front of his residence.

Officer Armstrong watched live video footage from his drone and noted that BAHRAMI was not in front of his house as he claimed. Officer Armstrong advised Officer Merrill that BAHRAMI did not leave the house.

Sergeant Mulholland arrived on scene and told all the staged officers to reposition to a different staging area closer to location #1. Officer Armstrong told Sgt. Mulholland about his prior encounter with BAHRAMI.

At one point during the incident Officer Armstrong noticed the battery on his surveillance drone was failing. A second drone operator, Officer Pachan, launched his drone. Shortly thereafter the battery to Officer Armstrong's drone failed and his drone fell onto a neighbor's yard.

Officer Armstrong left the staging area to locate his drone. Officer Armstrong was initially unable to find his drone and began to return to the staging area. While driving back to the scene he heard Officer Pachan advise over the radio that BAHRAMI left his home. Officer Pachan further advised BAHRAMI did not appear to have anything in his hands when he left the residence.

When Officer Armstrong arrived back to the staging area, he saw officers lined up from right to left from the west curbline. Officer Armstrong was approximately thirty to forty feet behind the officers. He saw BAHRAMI in the middle of the street, and it appeared BAHRAMI was trying to run around the officers. BAHRAMI was approximately twenty feet from the officers and was holding a large kitchen knife in his right hand.

One of the officers said something similar to, "Don't, Don't, Stop, Stop." Officer Armstrong heard a 40mm less lethal launcher fire and then heard numerous gunshots. Officer Armstrong pulled out his firearm and ran up to the other officers. Officer Armstrong saw BAHRAMI was struck by gunfire and fell to the ground. Officer Armstrong was behind the officers who fired at BAHRAMI and never saw which officer or officers discharged their firearm.

BAHRAMI continued to hold his knife in his hand after falling to the ground. Multiple officers yelled at BAHRAMI to drop the knife, but he did not comply. Officer Molina approached BAHRAMI and kicked the knife out of his hand.

BAHRAMI was handcuffed and Officer Armstrong began to administer medical aid. Approximately one minute passed between shots being fired to when officers began providing lifesaving efforts.

Officer Armstrong saw several bullet holes in BAHRAMI's chest and arm. BAHRAMI had a pulse, but his breathing appeared labored. Officer Armstrong administered multiple chest seals to the

front and back of BAHRAMI's torso. Officer Armstrong recalled four to five bullet holes to Bahrami's chest and possible exit wounds to his back.

Officer Molina provided CPR to BAHRAMI until paramedics took over life saving measures. Officer Armstrong checked BAHRAMI's pulse a second time, as the paramedics provided assistance, but could not locate a pulse.

BAHRAMI's mother approached the officers as they were providing medical aid to BAHRAMI. Sergeant Mulholland and Officer Pachan led her away from the scene.

Eventually Officer Armstrong began to put up crime scene tape around the scene of the incident. At this time a neighbor approached him and told him home video surveillance footage captured the shooting. Officer Armstrong watched the video footage, which depicted the moments leading up to and including the fatal incident.

**Interview of EMS/Medical Personnel:**

**Interview of Paramedic John Riddle**

On July 2, 2025, Antioch Police Department Detectives Ibanez and Schaffer interviewed Paramedic John Riddle at the AMR Deployment Center in Antioch. Listed below is a summary of his statement:

On 6/30/2025 Paramedic Riddle was assigned to Medic 89. Paramedic Riddle was with EMT Stuart Vignau when they received a call for service at location #1. They responded to the call and arrived at location #1 at approximately 7:40 am.

When they arrived on scene they were directed to a subject [later identified as BAHRAMI] who was on the ground. Paramedic Riddle did not know the police shot BAHRAMI when he arrived on scene but saw officers holding bloody wound dressings on BAHRAMI. BAHRAMI was unresponsive. Paramedic Riddle asked the officers if BAHRAMI had a pulse and was told he did not. He directed an officer to start CPR on the subject and retrieved his CPR bag and heart monitor.

A short time later members from the Fire Department arrived on scene. Paramedic Riddle hooked up a medical monitor to BAHRAMI, but did not detect any heart activity. In addition, Paramedic Riddle did not locate a pulse and noticed that BAHRAMI was not breathing. Paramedic Riddle declared the BAHRAMI deceased at approximately 7:54 am.

**Interview of EMT Stuart Vignau**

Antioch Police Department Detectives Ibanez and Schaffer interviewed EMT Stuart Vignau at approximately 8:29 am at the AMR Deployment Center in Antioch. EMT Vignau provided a statement to detectives that was consistent with the statement provided by Paramedic Riddle.

**<u>Civilian Interviews:</u>**

**Interview of (W1): David BAHRAMI's sister**

On June 30th, 2025, at approximately 1055 hour, (W1) was interviewed by CCCDAO Senior Inspector Ann Shiraishi, Antioch Police Detective Allen, and Antioch Police Detective Morris. The interview was conducted at the family's residence. Listed below is a summary of her statement:

(W1), (W2), and BAHRAMI are siblings. BAHRAMI graduated from college approximately two weeks ago and recently moved back into the family home in Antioch.

(W1) described BAHRAMI as having a history of mental illness. Back in December of 2024, BAHRAMI was placed on a psychiatric hold (5150 W&I). BAHRAMI was diagnosed with schizophrenia and bipolar disorder. He took daily oral medication and monthly intravenous medication to help him control his disorders. The medication changed BAHRAMI's behavior in a positive way because he was "really nice and respectful."

BAHRAMI did not have any suicidal tendencies, and she has never known him to carry any weapons.

Days prior to June 30th, 2025, BAHRAMI became quieter than usual.

On June 30, 2025, (W1) was asleep in the house when her brother (W2) and mother (W4) came into her room, woke her up, and told her someone had been shot in front of their home.

(W1) and her mother ran outside. (W1) saw BAHRAMI on the ground in the street. A white bandage was on his body and police officers were giving him "compressions" (CPR). (W1)'s mother told her she saw three officers hold BAHRAMI while a fourth officer shot him. Her mother told her that BAHRAMI said, "Please don't shoot me."

**Interview of (W2): David BAHRAMI's brother**

On June 30th, 2025, at approximately 1055 hours, (W2) was interviewed by CCCDAO Senior Inspector Ann Shiraishi, Antioch Police Detective Allen, and Antioch Police Detective Morris. The interview was conducted at the family's residence. Listed below is a summary of his statement:

David BAHRAMI is his brother. BAHRAMI is a quiet and happy person, but he was stressed while he attended college.

In December 2024, the family noticed BAHRAMI was always very serious and would talk to himself. This behavior worsened and the family called the police for assistance. BAHRAMI was placed on a psychiatric hold and entered a psychiatric hospital (pursuant to Welfare and Institution Section 5150).

When BAHRAMI returned home from the psychiatric hospital he came across as a different person. BAHRAMI was prescribed medication which helped him be a nicer person to his family and he appeared happy. He recently graduated from college, bought a new car, and was going to start a new engineering job.

In the last two days BAHRAMI's demeanor changed. He appeared to be stressed again, and he became very quiet. (W2) did not know what triggered the change in BAHRAMI's behavior.

On the night of June 29, 2025, he came home from work, spoke with his family, and nothing appeared to be out of the ordinary. At approximately 11:00 pm, (W2) went into his bedroom to go to bed for the night and saw BAHRAMI go into his bedroom.

On June 30, 2025, (W2) was awoken from his sleep by the sound of five gunshots. (W2) ran to wake up his father. Everyone in the family yelled for BAHRAMI, but there was no response. His mother and sister ran downstairs and out of the house to find out what was going on.

(W2) stated that their home was equipped with surveillance video. (W2) gave Senior Inspector Shiraishi access to the homes CCTV recordings. Senior Inspector Shiraishi obtained a copy of the recording.

**Interview of (W3): BAHRAMI's father**

On June 30th, 2025, at approximately 1055 hours, BAHRAMI's father provided a brief statement to CCCDAO Senior Inspector Ann Shiraishi, Antioch Police Detective Morris, and Antioch Police Detective Allen. The statement was provided at the family's residence. Listed below is a summary of his statement:

BAHRAMI was happy and recently graduated from Cal Poly San Luis Obispo with an engineering degree.

On June 29th, 2025, he saw BAHRAMI go to bed at approximately 11:00 pm.

On the morning of June 30, 2025, (W3) was awakened by the sound of gunshots in front of his house. Everyone ran outside and saw BAHRAMI was shot.

**Statements made by (W4): David Bahrami's Mother**

On the date of the fatal incident, CCCDAO Senior Inspector Ann Shiraishi, Antioch Police Detective Geoffrey Morris and Antioch Police Detective Ashley Allen contacted David BAHRAMI's mother (W4) inside the garage of location #1. Senior Inspector Shiraishi and APD Detective Allen explained to the family they had to exit their residence because a search the residence for any relevant evidence would be conducted pursuant to a search warrant. (W4) asked where she was supposed to go and said she wanted to stay at the residence. (W4) told them she wanted to ask a question, and stated the following:

(W4) walked with BAHRAMI on a nightly basis around the neighborhood. Today, BAHRAMI walked the neighborhood alone when he was contacted by the police. While the police held BAHRAMI's hands behind his back, they shot him three (3) times. (W4) asked Detective Morris and Inspector Shiraishi why the police acted in this manner.

Senior Inspector Shiraishi asked (W4) to exit the garage so they could continue to speak with her. However, (W4) refused and said she did not want to speak with police any further.

While speaking with other family members, (W4) repeatedly walked in and out of the residence. At which point, Senior Inspector Shiraishi asked (W4), "Can you please stay outside?" (W4) did not remain outside, entered the kitchen, and began to clean the home. Antioch Police Detective Allen, who was standing nearby, asked to (W4) to stop cleaning the house and exit the home. (W4) ignored the officers until her daughter, (W2), spoke to (W4). (W4) and family then exited the home.

While at location #1, Antioch Police Detective Allen saw (W4) walk around the garage and throw unknown items into a garbage can outside the residence. Detective Allen opened the lid to the garbage can and saw an empty rifle bag located inside. Detective Allen advised the evidence collection team of what she observed, and the scene was secured.

No additional statements were obtained from (W4) due to her desire not to speak with police and video evidence that confirmed (W4) did not personally observe the fatal incident.

**Autopsy:**

On July 3, 2025, at approximately 10:00 am, Pathologist Dr. Alex Blank conducted the autopsy of David BAHRAMI at the Contra Costa Sheriff Coroner's Office in Martinez. Present at the autopsy were CCCDAO Senior Inspector John Garcia, Antioch Police Detective JJ Jeong, Antioch

Police Detective Erik Nilsen, Forensic Technician Richard Rosalas and Forensic Technician Carolina Ramos.

The autopsy revealed that BAHRAMI was shot multiple times in his torso, legs, and arms. BAHRAMI's official cause of death was listed as "gunshot wounds."

**LEGAL PRINCIPLES**

The California District Attorneys Association Uniform Crime Charging Standards Manual directs that criminal charges shall not be brought unless the prosecutor, based upon a complete investigation and thorough consideration of all the pertinent information readily available to him or her, believes there is evidence that proves beyond a reasonable doubt, that the accused is guilty of the crime to be charged. Additionally, the charging standards direct that there must be legally sufficient admissible evidence to prove each element of the crime. The admissible evidence must be of such convincing force that it would warrant conviction of the crime charged by a reasonable and objective fact finder after the fact finder has heard all the evidence and after considering the most plausible, reasonable, and foreseeable defenses that could be raised under the evidence.

The applicable California Penal Code Sections are as follows:

**Section 187:** Murder is the unlawful killing of a human being or fetus with malice aforethought.

To Prove this crime the people must prove that:

1. The defendant committed an act that caused the death of another person and
2. When the defendant acted, he had a state of mind called malice aforethought **[CALCRIM 520]**

**Section 188**: Such malice may be express or implied.

Express Malice: Malice is express when there is manifested a deliberate intention unlawfully to take away the life of a human being.

Implied Malice: Malice is implied when the killing resulted from an intentional act, the natural consequences of the act are dangerous to human life, and the act was deliberately done with knowledge of the danger to and with conscious disregard for human life.

**Section 192**: Manslaughter is the unlawful killing of a human being without malice.

**Section 196**: Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either 1. In obedience to any judgement of a competent Court; or 2. When necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty; or 3. When necessarily committed when retaking felons who have been rescued or have escaped, or when necessarily committed in arresting persons charged with a felony, and who are fleeing from justice or resisting arrest.

**Section 197**: Homicide is also justifiable when committed by any person in any of the following cases:

1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or,

2. When committed in defense of habitation, property, person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends or endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or,

3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or

4. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace. Section 199: The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully acquitted and discharged. Any killing of a human being at the hands of another is a homicide.

A homicide may be criminal or justifiable depending upon the circumstances. It is justifiable if done while resisting a violent felony or in self-defense or in defense of another if it reasonably appears to the person claiming the right of self-defense or the defense of another that he or she actually and reasonably believed that he or she or another was in imminent danger of great bodily injury or death. (See *People v. Williams* (1977) 75 Cal. App. 3rd 731.) In protecting oneself or another, a person may use all force which he or she believes reasonably necessary, and which would appear to a reasonable person, in similar circumstances, to be necessary to

prevent the injury, which appears imminent. (See California Criminal Jury Instruction CALCRIM 505)

In order to justify killing another person in self-defense or in the defense of another, actual danger of death or great bodily injury is not necessary. (CALCRIM 505.)

**Penal Code Section 835a:**

(a) The Legislature finds and declares all of the following:

(1) That the authority to use physical force, conferred on peace officers by this section, is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Legislature further finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law.

(2) As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

(3) That the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

(4) That the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.

(5) That individuals with physical, mental health, developmental, or intellectual disabilities are significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement.

(b) Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

(c)(1) Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:

(A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person.

(B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

(2) A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.

(d) A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this subdivision, “retreat” does not mean tactical repositioning or other de-escalation tactics.

(e) For purposes of this section, the following definitions shall apply:

(1) “Deadly force” means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

(2) A threat of death or serious bodily injury is “imminent” when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(3) “Totality of the circumstances” means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.

**<u>CALCRIM 220:</u> [Reasonable Doubt Jury Instruction]**

The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

A defendant in a criminal case is presumed innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [ ]

Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty.

**Section 199:** The homicide appearing to be justifiable or excusable, the person indicted must, upon his trial, be fully acquitted and discharged.

**CALCRIM 507:**

A homicide by a peace officer is justifiable and not unlawful when:

1. The defendant was a peace officer
   AND
2. The killing was committed while the defendant

either:

A. Reasonably believed, based on the totality of the circumstances, that the force was necessary to defend against an imminent threat of death or serious bodily injury to the defendant or another person;

OR

B. Reasonably believed, based on the totality of the circumstances, that:

(1) A person was fleeing a felony;
(2) That force was necessary to arrest or detain that person;
(3) The commissioned felony threatened or resulted in death or serious bodily injury,

AND

(4) The person will cause death or serious bodily injury to another unless immediately apprehended.

**CALCRIM 505. Justifiable Homicide: Self-Defense**

The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful (self-defense/ [or] defense of another) if:

1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury;

2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

AND

3. The defendant used no more force than was reasonably necessary to defend against that danger.

Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable, and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of death or great bodily injury has passed. This is so even if safety could have been achieved by retreating.

Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter.

## LEGAL ANALYSIS:

### I. Introduction

The legal issue to be decided by the CCCDAO is whether any involved law enforcement officers or civilians violated any criminal laws. The Contra Costa District Attorney's Office analyzes each fatal incident on the case specific facts and circumstances. The community, including the deceased, his family, and the involved officers deserve an independent factual and legal analysis. Whether someone is criminally liable depends on the facts of the case and whether those facts constitute a crime under the applicable laws.

### II. Legal Analysis:

The use of force by Officer Merrill, Officer Lorono, and Officer Molina was in lawful self-defense and defense of others. The officers reasonably believed they were in imminent danger of suffering great bodily injury; they reasonably believed the immediate use of force was necessary to defend against that danger; and they used no more force than was reasonably necessary under the circumstances. The officers acted reasonably under the circumstances based on the information available to them prior to making physical contact with BAHRAMI, BAHRAMI's conduct moments before force was used, and the officers' attempts to de-escalate the encounter prior to using force.

A. The Information Available to Officers Prior to Contacting BAHRAMI Would Lead a Reasonable Officer to Believe BAHRAMI May Violently Attack Officers on Scene.

Before officers made contact with BAHRAMI, they received information that would lead a reasonable officer to conclude they were responding to a potentially violent and dangerous encounter. The sources of this information included: 1) Police dispatch; 2) Police Records; and 3) Officer Merrill's phone conversation with BAHRAMI.

1) <u>Information Provided by Antioch Police Dispatch:</u>

The officers who responded to this incident were informed by police dispatch that BAHRAMI called 9-1-1 multiple times. During the calls BAHRAMI repeatedly stated that he was about to kill someone, which would lead the officers to reasonably believe that they were responding to a potentially deadly incident.

In addition, BAHRAMI informed dispatch of his address, but refused to provide his name and did not state who he was intending to kill. Instead, BAHRAMI asked dispatch how many police officers were going to respond to his location and when the police would arrive. As such, an officer advised of this information could reasonably conclude BAHRAMI may be attempting to lure police officers to his location in order to attack or kill them.

Furthermore, BAHRAMI told dispatch that he was at the house with his family, but in a separate 9-1-1 call he told dispatch that no one was with him. Although ultimately not true, an officer advised of this information could reasonably conclude that BAHRAMI may have harmed or would harm someone inside the home.

2) <u>Information Provided by Police Records.</u>

Prior to making contact with BAHRAMI responding officers became aware that BAHRAMI was placed on a psychiatric hold under Welfare and Institution Code Section 5150 on a prior occasion and that firearms were seized during that prior incident. An officer advised of this information could reasonably conclude the following: 1) BAHRAMI may be currently experiencing a mental break and may act out irrationally and/or inflict harm on others; 2) BAHRAMI may attempt to engage in "suicide by cop" by intentionally behaving in a threatening or deadly way towards law enforcement, with the goal of provoking the officers to use lethal force against him; and 3) BAHRAMI may have access to additional firearms or weapons inside the home that could potential be used against them, or against an innocent bystander.

3) Officer Merrill's Phone Conversation with BAHRAMI:

Prior to making contact with BAHRAMI, the officers on scene called BAHRAMI and learned information that would lead an officer to reasonably conclude that BAHRAMI may violently attack police or an innocent bystander.

BAHRAMI told officer Merrill his family was in the home with him, but that they could not come outside. Later during the call, BAHRAMI told Officer Merrill his family could not come outside because they were asleep. An officer presented with this information could reasonably question whether or not this was in fact true, especially in light of the fact that BAHRAMI called 9-1-1 three times due to an alleged emergency at his location. An officer could reasonably conclude that family members inside the home were not in fact asleep but were potentially in danger.

In addition, BAHRAMI told Officer Merrill he cut himself, but when asked what he cut himself with, he could not provide an answer. BAHRAMI further stated that he did not have any weapons, which ultimately police realized was not true when BAHRAMI pulled out his knife. As such, an officer under these circumstances could reasonably conclude that BAHRAMI intentionally provided the officers with false information over the phone in order to catch them off guard and attack them.

Furthermore, although BAHRAMI told police he cut himself, he claimed he did not need medical personnel and only wanted the police to respond. When asked why he did not want medical personnel, BAHRAMI said, "You are enough to do the job." Officer Merrill asked BAHRAMI what job he wanted the officers to do, but BAHRAMI did not provide an answer. These cryptic and somewhat ominous statements would cause a reasonable officer to further believe that BAHRAMI may attack police when they arrive on scene.

Lastly, BAHRAMI threatened the police by telling them if police did not come to his home, he was going to either kill or harm his neighbor. Based on this statement the officers on scene were in a position where they could no longer attempt to de-escalate the situation by speaking to BAHRAMI over the phone. If the officers did not attempt to quickly contact and detain BAHRAMI, he may carry out his threat to harm or kill an innocent bystander.

In response to this threat the officers on scene formulated a reasonable plan based on a rapidly evolving situation. Officers were assigned various use of force roles and BAHRAMI was asked to leave the house. By asking BAHRAMI to leave the home, officers sought to minimize the potential danger to family members who may have been inside and to reduce the possibility of a hostage situation or barricaded subject.

B. BAHRAMI's Actions when Contacted by Police Demonstrated an Intent to inflict Imminent Great Bodily Injury on Responding Officers

BAHRAMI's actions after he came face-to-face with police demonstrated an intent to inflict imminent great bodily injury or death on one or more of the officers. After officers made visual contact with BAHRAMI, they ordered him to stop a safe distance away from their location. BAHRAMI followed the officer's commands to stop, but did not follow their subsequent order to get on his knees.

Instead of following this command, BAHRAMI pulled out a large knife and began to run in front of the officers. At this point BAHRAMI's intentions became very clear. BAHRAMI was not going to follow the officers' commands, and he did not intend for this encounter to end peacefully.

Officer Molina attempted to stop BAHRAMI by firing his 40 mm less lethal launcher, but unfortunately BAHRAMI appeared unfazed. He did not stop and he did not drop his knife. Instead, BAHRAMI continued to run with the knife in his hand. In response, the officers on scene were reasonably fearful that BAHRAMI would try and close the distance between them and stab them with the knife.

BAHRAMI continued to run with the knife in his hand and eventually turned towards the officers and took a direct path to their location. The officers on scene continued to be fearful for their safety, especially in light of the fact that the use of less lethal force proved ineffective, and BAHRAMI continued to close the distance between them. At this point Officer Molina did not have sufficient time to re-load the 40 mm less lethal option as BAHRAMI would be in stabbing distance within seconds. As such, Officer Lorono and Officer Merrill fired their semi-automatic handguns at BAHRAMI, who was approximately 15-20 feet away, to prevent themselves from potentially suffering great bodily injury or death from an imminent knife attack. BAHRAMI was struck multiple times and fell to the ground after the officers simultaneously fired 20 rounds, in rapid succession.[5]

After BAHRAMI fell to the ground, officers needed to immediately transition to providing lifesaving aid. BAHRAMI, however, maintained his grip on the knife and therefore, still posed a danger to approaching officers. Officers ordered him to drop the knife, but BAHRAMI did not obey those commands. In response, officers used non-lethal force to remove the knife so they could begin administering lifesaving aid as soon as possible.

[5] Although BAHRAMI's mother (W4) provided a different factual account of what occurred, her version of events is inconsistent with the available video footage and witnesses on scene.

C. The Responding Officers Attempted Reasonable De-Escalation Tactics Prior to the Use of Force.

During this encounter, responding officers attempted to utilize two primary de-escalation tactics: time and distance. Utilizing time and distance can help calm intense emotions, reduce the likelihood of impulsive reactions, demonstrates patience and respect to the individual involved, allows for alternative options, and prevents reactions from feeding off of each other.

Responding officers repeatedly utilized time and distance to de-escalate this encounter. Instead of immediately rushing into the home, officers staged nearby and opened a line of communication over the phone. Officer Merrill spoke to BAHRAMI for an extended period of time and repeatedly called BAHRAMI back when BAHRAMI would hang up on him.

During the calls, Officer Merrill asked BAHRAMI about the nature of the emergency and whether BAHRAMI needed medical aid. Officer Merrill repeatedly attempted to have family members come outside to gauge what was happening in the home and to reduce the chances of family members being harmed. Officer Merrill used a casual tone during his conversation and presented as open and non-confrontational. For example: at one point during the conversation Officer Merrill offered to pick up breakfast for BAHRAMI on the way to his residence.

Ultimately, BAHRAMI's own actions prevented the officers from continuing to de-escalate the situation over the phone. BAHRAMI threatened the officers that if they did not respond to his house, he would harm or kill his neighbor. As such, the officers were placed into a position where they were compelled to physically contact BAHRAMI or face the possibility that he would carry out his threat to kill his neighbor, or some other third party.

Finally, officers continued to try and utilize time and distance to de-escalate the encounter even after he walked to their location. When BAHRAMI approached, Officer Merrill told BAHRAMI to stop while he was still a safe distance away. BAHRAMI refused to do so. Instead, he pulled out a knife and eventually ran at the officers. It was not until BAHRAMI was mere seconds away from the officers that they utilized lethal force.

**Conclusion**

For all of the reasons listed above, the use of force by Officer Merrill, Officer Lorono, and Officer Molina was reasonable under the circumstances. The officers acted in lawful self-defense/defense-of-others in response to an exigent situation where the officers on scene were in imminent danger of suffering great bodily injury. As such, no further action will be taken in this case.